UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT NEW YORK

Lavelle D. Evans,

Plaintiff,

- against -

The First 48 (Television Show); Marcia Xintaris (Executive in charge of Production); Granada America Entertainment and Kirkstall Road Enterprises, Inc.; and A&E Television Station,

Defendants.

Index No. 09 Civ. 7373 (LTS) (AP)

**ORAL ARGUMENT REQUESTED**

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS, OR IN THE ALTERNATIVE FOR SUMMARY JUDGMENT**

**Linda Steinman**
**Elisa L. Miller**
**DAVIS WRIGHT TREMAINE LLP**
1633 Broadway
New York, New York 10019-6708
Tel: (212) 489-8230
Fax: (212) 489-8340

Attorneys for Defendants

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..... ii

PRELIMINARY STATEMENT ..... 1

STATEMENT OF FACTS ..... 2

ARGUMENT ..... 5

1. Standard of Review ..... 5
2. The Misappropriation of Image Claim Must Fail ..... 6
3. Evans' Claim Also Fails Under Arkansas and Texas Law ..... 11

CONCLUSION ..... 14

# TABLE OF AUTHORITIES

Page(s)

**CASES**

*Alfano v. NGHT, Inc.*,
623 F. Supp. 2d 355 (E.D.N.Y. 2009) ....................7, 9, 10

*Arrington v. New York Times Co.*,
55 N.Y. 2d 433, 449 N.Y.S.2d 941 (1982) ....................7, 10, 11

*Ashcroft v. Iqbal*,
___ U.S. ___, 129 S.Ct. 1937 (2009) ....................5

*Aucoin v. Comerica Secs., Inc.*
No. 3:08-CV-1275-D, 2008 U.S. Dist LEXIS 82661 (N.D. Tex. Oct. 15, 2008) ....................13

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544, 127 S. Ct. 1955 (2007) ....................6

*Bement v. NYP Holdings, Inc.*,
307 A.D.2d 86, 760 N.Y.S.2d 133 (1st Dept. 2003) ....................10

*Benavidez v. Anheuser Busch, Inc.*,
873 F.2d 102 (5th Cir. 1989) ....................12

*Conley v. Gibson*,
355 U.S. 41 (1957) ....................5

*Finger v. Omni Publications Int'l, Ltd.*,
77 N.Y.2d 138, 564 N.Y.S.2d 1014 (1990) ....................8, 10

*Geldzahler v. N.Y. Med. College*,
No. 09 Civ. 1791, 2009 U.S. Dist. LEXIS 96465 (S.D.N.Y. Oct. 19, 2009) ....................6

*Groden v. Random House, Inc.*,
61 F.3d 1045 (2d Cir. 1995) ....................7, 11

*Henley v. Dillard Dep't Stores*,
46 F. Supp. 2d 587 (N.D. Tex 1999) ....................13

*Hoepker v. Kruger*,
200 F. Supp. 2d 340 (S.D.N.Y. 2002) ....................11

*Howell v. New York Post Co.*,
81 N.Y.2d 115, 596 N.Y.S.2d 350 (1993) ........ 7, 9

*Huggins v. Moore*,
94 N.Y.2d 296, 704 N.Y.S.2d 904 (1999) ........ 8

*Jones v. Capital Cities/ABC Inc.*,
874 F. Supp. 626 (S.D.N.Y. 1995) ........ 7

*Kane v. Comedy Partners*,
No. 00 Civ. 158, 2003 U.S. Dist LEXIS 18513 (S.D.N.Y. Oct. 15, 2003), *aff'd*, 98 Fed. Appx. 73 (2d Cir. 2004) ........ 11

*Lemerond v. Twentieth Century Fox*,
No. 07 Civ. 4635, 2008 WL 918579 (S.D.N.Y. Mar. 31, 2008) ........ 9

*Lerman v. Flynt Distributing Co.*,
745 F.2d 123 (2d Cir. 1984) ........ 7, 9, 10

*Matthews v. Wozencraft*,
15 F.3d 432 (5th Cir. 1994) ........ 12, 13

*McCarville v. American Tobacco Co.*, 11 Media L. Rep. 2344 (Sup. Ct. N.Y. Co. 1985) ........ 9

*Meadows v. Hartford Life Ins., Co.*,
492 F.3d 634 (5th Cir. 2007) ........ 13

*Messenger v. Gruner + Jahr Printing and Publishing*,
94 N.Y. 2d 436, 706 N.Y.S.2d 52 (2000) ........ 6, 7, 8, 10

*Myskina v. Conde Nast Publications, Inc.*,
386 F. Supp. 2d 409 (S.D.N.Y. 2005) ........ 9

*Neitzke v. Williams*,
490 U.S. 319 (1989) ........ 5

*Olan Mills, Inc. v. Dodd*,
234 Ark. 495, 353 S.W.2d 22 (1962) ........ 12

*Psihoyos v. National Examiner*,
No. 09 Civ. 7624, 1998 U.S. Dist LEXIS 9192 (S.D.N.Y. June 22, 1998) ........ 8

*Roth v. Jennings*,
489 F.3d 499 (2d Cir. 2007) ........ 6

*Smigo v. NYP Holdings*,
No. 108756/08, 2008 WL 4918667 (Sup. Ct. N.Y. Co. Nov. 13, 2008) ........ 9

*Stanley v. General Media Communications, Inc.*,
149 F. Supp. 2d 701 (W.D. Ark. 2001)....12

*Stephano v. News Group Publ'ns*,
64 N.Y.2d 174, 485 N.Y.S.2d 220 (1984)....7, 8, 9

*Ward v. Klein*,
10 Misc.3d 648, 809 N.Y.S.2d 828 (Sup. Ct. N.Y. Co. 2005)....9

*Whitehurst v. Showtime Networks, Inc.*,
No. 08 Civ. 47, 2009 U.S. Dist LEXIS 87530 (E.D. Tex. Aug. 28, 2009)....12

**STATUTES**

New York Civil Rights Law §§ 50, 51.... passim

Fed. R. Civ. P. 12(b)(6)....1, 5, 6

Fed. R. Civ. P. 56....1

**OTHER AUTHORITIES**

Restatement (Second) of Torts §652(c)....11

Defendants ITV Studios, Inc. (formerly Granada America) (incorrectly sued herein as Granada America Entertainment and The First 48), Kirkstall Road Enterprises, Inc., Marcia Xintaris (collectively "ITV"), and A&E Television Networks, LLC (incorrectly sued herein as A&E Television Station) ("A&E"), respectfully submit this Memorandum of Law in support of their motion, pursuant to Fed. R. Civ. P. 12(b)(6), to dismiss the claims asserted against them in the Complaint for failure to state a claim upon which relief can be granted, or in the alternative for summary judgment under Fed. R. Civ. P. 56.

## PRELIMINARY STATEMENT

Plaintiff Lavelle Evans brings a commercial misappropriation claim against Defendants for the use of his image without his consent in two related television programs. Mr. Evans was charged and convicted of murdering his girlfriend, who was scheduled to testify against him in a drug case. The documentary television series *The First 48* recounted the Dallas police's investigation into the murder, and the follow-up program titled *After the First 48* depicted plaintiff's subsequent capital murder trial in Texas, featuring lengthy interviews of the prosecutor and defense counsel.[1] The programs include a few photographs of Mr. Evans, and a brief video clip of his interrogation at the police station. Plaintiff's claim is patently defective as a matter of law. As the New York state and federal courts have reiterated time and again, the use of an individual's name or likeness in a television program or other similar editorial work does not qualify as a use for "trade" or "advertising" purposes as is required to invoke the protection of the New York misappropriation statute, Sections 50 and 51 of the New York Civil Rights Law. Rather, under New York law, as well as Arkansas and Texas law (where the events

[1] A DVD of Episode 68 of *The First 48* (the "Program") is annexed as Exhibit A to the Affidavit of Linda Steinman dated December 1, 2009 ("Steinman Affidavit"), and Episode 4 of *After the First 48* (the "Follow-up Program") is annexed to the Steinman Affidavit as Exhibit B.

depicted took place), film producers and broadcasters creating programs on newsworthy subjects, such as criminal behavior, may make use of an individual's name and likeness without his or her consent – a policy rooted in the First Amendment. Thus, based on nothing more than the Complaint and the television programs, Plaintiff's Complaint cannot stand as a matter of law and should be dismissed with prejudice.

## STATEMENT OF FACTS

*The First 48* is a documentary television program produced by ITV for A&E that depicts various homicide detective units throughout the country as they investigate a specific crime, usually a murder. As is evident from its title, the program focuses on the first 48 hours of the investigation – the most critical time-period for solving a homicide – and aims to provide a realistic portrayal of the investigative process. Each individual episode generally follows one or two murder investigations in different cities. *The First 48* field producers film the police as they pursue an investigation, and ITV eventually edits the program into a one-hour show. *The First 48* premiered in June 2004 and is currently in its 9th season on the A&E Network. In 2006, the Series was a finalist/nominee for the Distinguished Documentary Achievement Award in the Continuing Series category awarded by the International Documentary Association (IDA).

On *After the First 48,* an occasional special series, the producers revisit selected investigations from *The First 48* to explore the aftermath of the homicide and police investigation, including the outcome of the eventual trial. The producers interview the police to gather their reflections on the investigation, the prosecutors and defense attorneys to explore their theories of the case and the challenges they faced at the trial, witnesses, the victim's family, and occasionally the defendant. These interviews, along with flashbacks to the original

investigation as seen on *The First 48*, and, in some cases, the trial footage, are edited into a one-hour program.

On March 30, 2007, A&E aired Episode #68 of *The First 48*, titled "Silenced" (hereinafter, the "Program"). The Program depicted the investigation by Dallas police detectives Bob Ermatinger and Ken Penrod into the murder of Crystal Jenkins, whose body was found on the shores of White Rock Lake in Dallas, TX. It took the detectives several days to identify Ms. Jenkins, an Arkansas resident, and a substantial portion of the Program is devoted to the crime scene investigation, a false lead, and the officers' efforts to identify the victim. Steinman Aff., Ex. A. Mr. Evans' mug shot appears for the first time almost thirty-five minutes into the forty-nine minute-long program, when he is identified by Arkansas police as Ms. Jenkins' ex-boyfriend and a co-defendant in a drug case. *Id.* at 34:37. Ms. Jenkins' mother informs Detective Penrod that Ms. Jenkins was scheduled to testify against Evans in the 2006 drug case, thus providing a potential motive for the murder. *Id.* at 36:50. Detectives then learn that at the time of the murder, Evans was under house arrest in Arkansas on a federal weapons charge. *Id.* at 37:46. Although he was being monitored by authorities with a wrist unit, the device lost power on the night of the murder, and came back on line the following morning. *Id.* at 38:00-38:15. After detectives interview Mr. Evans' cousin in Dallas and review his cell-phone records, Mr. Evans is brought to the police department in Arkansas where he is questioned by Dallas police. At the end of the Program, Mr. Evans is shown for several seconds walking through the police station and sitting in a police interrogation room, and he is heard saying only: "Not really, because I've already been advised by my attorney not to say anything without him present." *Id.* at 45:20-25; 29-31; 45:43-45, 45:50-59; 47:27-31. As the Program notes, following the investigation, Evans was charged with capital murder. *Id.* at 48:44.

Mr. Evans' case was covered in the news media in both Dallas and Mr. Evans' hometown of El Dorado, Arkansas.[2] Indeed, coverage of the trial, including Mr. Evans' name and image, was the front page story in the local *El Dorado News Times*. Steinman Aff., Ex. B at 00:23; 37:35; 43:30. On August 28, 2008, Mr. Evans was convicted of capital murder and received a life sentence without the possibility of parole. *Id.* at 45:45.

On January 25, 2009, A&E aired Episode 4 of *After the First 48*, titled "Downstream Drifter/Silenced" (hereinafter, the "Follow-up Program"). The Follow-up Program revisited two investigations that had been the subject of *The First 48* episodes, including the murder of Crystal Jenkins by Mr. Evans. Along with flashbacks of footage from the Program, the Follow-up Program featured interviews with the prosecutor in the Evans case, Marc Moffit, and with Mr. Evans' two defense attorneys, Robbie McClung and Richard Franklin, who each analyzed the strengths and weaknesses of their respective cases. It also included interviews of the detectives reflecting on the Crystal Jenkins investigation, one of the trial jurors, who discussed the persuasiveness of certain pieces of evidence, and Ms. Jenkins' family discussing the impact Crystal's murder had on their lives as well as their feelings about the trial. Steinman Aff., Ex. B. The twenty-five minute segment of the Follow-up Program briefly included Evans' mugshots, photos of him with the victim that belonged to the victim and were released by her family, several seconds of surveillance footage of Mr. Evans at a convenience store, and a total of approximately 20 seconds of footage of Mr. Evans' at the Arkansas police station, including the same brief police interview from the Program. *Id.*

---

[2] *See, e.g.*, Tiara Ellis, "Jury Convicts Arkansas Man in White Rock Lake Murder," Dallas Morning News, August 28, 2008, available at: http://www.dallasnews.com/sharedcontent/dws/dn/latestnews/stories/082908dnmetmurdertrial.1eb4f007.html (last visited November 19, 2009)

On July 23, 2009, Mr. Evans filed a complaint against ITV and A&E for "illegal use of an image" in the Program and Follow-up Program. Compl. at 3. He asserts that, "Without my knowledge of what was happening, I was filmed by individuals for the TV show *The First 48*. Later that day I refused to sign a consent form to be aired on the show. However, against my protests, footage of me was shown on national television and continues to be shown." *Id.* Mr. Evans claims to have suffered mental anguish and negative public opinion (presumably as a result of the airing of his name and image on the programs as distinct from his arrest and conviction), and alleges that the "airing of the show placed my life in danger by certain racial groups." *Id.* Mr. Evans seeks a permanent injunction as well as $250,000 in damages.

## ARGUMENT

### 1. Standard of Review

One of the primary purposes of Fed. R. Civ. P. 12(b)(6) is to permit the Court to terminate lawsuits that are fatally flawed in their legal premises and destined to fail, and thus to spare the litigants the burdens of unnecessary pretrial and trial activity. *Neitzke v. Williams*, 490 U.S. 319, 326-27 (1989). A claim may be dismissed either because it asserts a theory that is not cognizable as a matter of law, or because it fails to allege sufficient facts to support a cognizable legal claim. *Id.* ("Rule 12(b)(6) authorizes a court to dismiss a claim on the basis of a dispositive issue of law.... If as a matter of law, it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations, a claim must be dismissed, without regard to whether it is based on an outlandish legal theory or on a close but ultimately unavailing one."). Although the Court takes the facts in the light most favorable to the plaintiff, dismissal is appropriate when a "plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957); *see also Ashcroft v. Iqbal*, ___ U.S. ___, 129 S.Ct. 1937, 1951 (2009) (the allegations must "nudge[] [his] claims

across the line from conceivable to plausible"); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S. Ct. 1955, 1965 (2007) (the complaint's allegations "must be enough to raise a right to relief above the speculative level."). This is true even for pro se litigants, as a pro se's party status does not relieve the party of the burden of alleging sufficient facts and a "plausible" theory on which a recognized legal claim could be based. *Geldzahler v. N.Y. Med. College*, No. 09 Civ. 1791, 2009 U.S. Dist. LEXIS 96465 at *20 (S.D.N.Y. Oct. 19, 2009) ("the Court must use less stringent standards than if the complaint had been drafted by counsel and must construe a pro se complaint liberally. However, dismissal under Rule 12(b)(6) is proper if the complaint lacks an allegation regarding an element necessary to obtain relief. Thus, the duty to liberally construe a plaintiff's complaint is not the equivalent of a duty to re-write it." (internal citations and quotation marks omitted)). As set forth below, Plaintiff's complaint should be dismissed since it asserts a claim that is not cognizable as a matter of law. [3]

**2. The Misappropriation of Image Claim Must Fail**

Plaintiff's claim that Defendants used his image without his consent in the Program and Follow-Up Program falls under Sections 50-51 of the New York Civil Rights Law.[4] New York does not recognize common-law claims for misappropriation, invasion of privacy and/or "right of publicity" in connection with the alleged use, without consent, of an individual's name or likeness. *See, e.g., Messenger v. Gruner + Jahr Printing and Publishing*, 94 N.Y. 2d 436, 706

[3] On a motion to dismiss, the Court may consider documents referenced or incorporated in the Complaint, even where such documents are not attached to the Complaint. *Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007) (considering documents filed with the SEC not attached to the complaint where complaint alleged fraud in those documents); *Stewart v. World Wrestling Federation Entm't*, Inc., No. 03 Civ. 2468, 2005 WL 66890, at *2 (S.D.N.Y. Jan. 11, 2005) (incorporating document plaintiff "both cited and relied upon . . . in his complaint"). Even if the Program and Follow-Up Program had not been incorporated by reference, it would still be appropriate for this Court to consider them, as they are clearly documents "upon which [the complaint] *solely* relies and which [are] *integral to the complaint.*" *Roth*, 489 F.3d at 509 (emphasis in original).

[4] Mr. Evans' claim is likewise meritless under the equivalent common law of Arkansas or Texas, *see infra* Part 3.

N.Y.S.2d 52 (2000); *Groden v. Random House, Inc.*, 61 F.3d 1045, 1049 (2d Cir. 1995) ("In New York, there is no common law right of privacy [citations omitted] or publicity [citations omitted], and sections 50 and 51 afford the only available remedy."); *Lerman v. Flynt Distributing Co.*, 745 F.2d 123, 129 (2d Cir. 1984) (stating that "New York's highest court has consistently reminded litigants [in commercial misappropriation cases] that, 'there exists no so-called common law right to privacy' in New York"); *Alfano v. NGHT, Inc.*, 623 F. Supp. 2d 355, 358-59 n.1 (E.D.N.Y. 2009), citing *Stephano v. News Group Publ'ns*, 64 N.Y.2d 174, 183, 485 N.Y.S.2d 220, 224 (1984). Rather, all such claims are governed by Sections 50 and 51 of the New York Civil Rights Law, which provide a cause of action to a person whose name, portrait, or picture is used for advertising purposes or purposes of trade without first obtaining his or her written consent. *Howell v. New York Post Co.*, 81 N.Y.2d 115, 596 N.Y.S.2d 350 (1993); *see also Jones v. Capital Cities/ABC Inc.*, 874 F. Supp. 626 (S.D.N.Y. 1995). The New York statute was "drafted narrowly to encompass only the commercial use of an individual's name or likeness and no other." *Arrington v. New York Times Co.*, 55 N.Y. 2d 433, 439, 449 N.Y.S.2d 941, 943 (1982). Because Plaintiff cannot show that the Program or the Follow-up Program used his image for advertising or trade, his claim must be dismissed as a matter of law.

The New York Court of Appeals has repeatedly held that Sections 50 and 51 are narrow in scope and provide a cause of action *only* for traditional advertising or other traditional commercial exploitations of a plaintiff's name or likeness. *Messenger*, 94 N.Y.2d 436; *Arrington*, 55 N.Y.2d at 439-40. Editorial uses such as documentaries or "publications concerned with newsworthy events or matters of public interest" simply do not fall within the narrow scope of the statutory phrases "advertising" and "trade" as those terms are used in Sections 50 and 51. *Howell*, 81 N.Y.2d at 123 ("a picture illustrating an article on a matter of

public concern is not considered used for the purpose of trade or advertising within the prohibition of the statute...unless it has no real relationship to the article or is an advertisement in disguise"); *Finger v. Omni Publications Int'l, Ltd.*, 77 N.Y.2d 138, 141-42, 564 N.Y.S.2d 1014, 1016 (1990) (granting motion to dismiss Section 50-51 claim against magazine).

The fact that Defendants profit from the airing of the Program and Follow-Up Program does not change the purpose of the work from editorial to advertising. "It is the content of the [program] and not the defendant's motive or primary motive to increase circulation which determines whether it is a newsworthy use, as opposed to a trade usage, under the Civil Rights Law." *Stephano v. New Group Publications*, 64 N.Y.2d 174, 185, 485 N.Y.S.2d 220, 225-26 (1984) (rejecting plaintiff's argument that article was an advertisement in disguise). "A contrary rule would unnecessarily and unrealistically limit the public interest exception to non-profit or purely altruistic organizations which are not the only, or even the primary, source of information concerning newsworthy events and matters of public interest." *Psihoyos v. National Examiner*, No. 09 Civ. 7624, 1998 U.S. Dist LEXIS 9192, at *19 (S.D.N.Y. June 22, 1998) (internal quotation marks and citations omitted). Indeed, in the similar context of a libel case, the New York Court of Appeals has emphasized that, "Absent clear abuse, the courts will not second-guess editorial decisions as to what constitutes matters of genuine public concern." *Huggins v. Moore*, 94 N.Y.2d 296, 303, 704 N.Y.S.2d 904, 908 (1999).

It is without question that a television series such as the Program and the Follow-up Program, which concern an investigation into the murder of a witness in a drug prosecution and the subsequent trial of the suspect, depict matters of public concern. New York construes "public concern" very broadly. *Messenger*, 94 N.Y.2d at 441-43 (holding that "newsworthiness...includes not only descriptions of actual events, but also articles concerning

political happenings, social trends or any other subject of public interest" and citing numerous case examples); *Myskina v. Conde Nast Publications, Inc.*, 386 F. Supp. 2d 409, 417 (S.D.N.Y. 2005) ("Newsworthiness' and 'public interest' in this context have been construed in most liberal and far-reaching terms to encompass all types of factual, educational and historical data, or even entertainment and amusement, concerning interesting phases of human activity in general."); *Stephano*, 64 N.Y.2d at 184. As a result, New York courts have consistently found that the "newsworthiness" exception applies not only to hard news of the type shown in *The First 48* shows, but also to television programs about rock singers and their romantic relationships, *Ward v. Klein*, 10 Misc.3d 648, 809 N.Y.S.2d 828 (Sup. Ct. N.Y. Co. 2005) (claim dismissed since use of former girlfriend's image in television show about Gene Simmons of KISS is of public interest and not for advertising or trade); gossip column items, *Smigo v. NYP Holdings*, No. 108756/08, 2008 WL 4918667 (Sup. Ct. N.Y. Co. Nov. 13, 2008); coverage of a wet t-shirt contest, *McCarville v. American Tobacco Co.*, 11 Media L. Rep. 2344 (Sup. Ct. N.Y. Co. 1985); and the Borat film, *Lemerond v. Twentieth Century Fox*, No. 07 Civ. 4635, 2008 WL 918579 (S.D.N.Y. Mar. 31, 2008), to name but a few.

Under these broad standards, television programs regarding crime, criminal investigations and criminal trials readily fall within the protection from liability. *See, e.g.*, *Alfano*, 623 F. Supp 2d at 359 (television program "Inside the Mafia", covering the trial of an organized crime figure, "surely" fell within the broad newsworthiness definition, even where it was not strictly historically accurate, and was to some extent fictionalized). In particular, where, like here, "plaintiff is…an actual participant in a newsworthy event," the use of his name or likeness "is not for purposes of trade within the meaning of Section 51." *Lerman*, 745 F.2d at 131; *see also Howell*, 81 N.Y.2d 115 (article about and photos of Hedda Nussbaum is in public

interest following her husband's murder of her daughter, amid speculation of Nussbaum's involvement). The fact that Mr. Evans' criminal trial and conviction were covered by newspapers in Arkansas and Texas only underscores the newsworthiness of the topic.

The very broad protection granted to the media to use an individual's name and likeness without consent is rooted in the First Amendment. As the Second Circuit stated, "Because the media in reporting the news routinely uses names and likeness without consent, New York courts early recognized the need to encourage the free exchange of ideas and created a broad privilege for the legitimate dissemination to the public of news and information . . . The trade purposes prong of the statute may not be used to prevent comment on matters in which the public has a right to be informed." *Lerman*, 745 F.2d at 131; *see also, Alfano*, 623 F. Supp. 2d at 359, citing *Arrington*, 55 N.Y.2d at 440 ("Mindful of its potential conflict with the First Amendment, courts have read Section 51 with 'sensitivity to . . . the values our State and Federal Constitutions bespeak in the area of free speech and press.'").

Further, it is equally clear that Mr. Evans cannot fit within the narrow instances in which liability can be imposed under sections 50-51 on a book, film or other editorial work, namely where the name or image bears "no real relationship" to the topic of public interest or constitutes "an advertisement in disguise." *Messenger*, 94 N.Y.2d at 444. As a criminal suspect, and later the convicted criminal, Mr. Evans is one of the prime subjects of the Program and the Follow-up Program, and thus his image obviously bears a "real relationship" to the content of the Program and Follow-up Program. *See, e.g., Bement v. NYP Holdings, Inc.*, 307 A.D.2d 86, 90, 760 N.Y.S.2d 133, 136 (1st Dept. 2003) ("the subject of the article is plaintiff's purported exploits during her reign as Miss Universe 1960, therefore use of her name and of a contemporaneous photo of her clad in a swimsuit clearly relate to the text of the article"); *Finger*, 77 N.Y.2d at

144 (rejecting plaintiff's claim that a photograph of a large family had "no real relationship" to an article on in vitro fertilization and the use of caffeine to enhance sperm velocity, even though none of the family members had been conceived through artificial insemination); *Arrington*, 55 N.Y.2d 433.[5]

In sum, there can be no dispute that the use of Mr. Evans' image in *The First 48* and *After the First 48* is of a non-commercial nature and relates to the editorial context in which it appears. Accordingly, Plaintiff's claim must be dismissed since it is defective as a matter of law.[6]

**3. Evans' Claim Also Fails Under Arkansas and Texas Law**

Defendants respectfully submit that this case should be governed by New York law since Defendants reside in New York and created the Program and Follow-up Program in New York. However, even assuming *arguendo* that either Arkansas law (where the filming took place) or Texas law (where the murder took place and Plaintiff currently is serving a sentence) applies, Plaintiff's claim fares no better and should be dismissed as a matter of law for the same reasons set forth above. Both Arkansas and Texas recognize a limited common law tort of "misappropriation" grounded on the Restatement (Second) of Torts §652(c), and the law

---

[5] Plaintiff's claim would not be saved even if an excerpt of the Program or Follow-up Program bearing his image was used in any advertisements for the Program or Follow-up Program. Courts in this Circuit have routinely recognized an exception to Sections 50 and 51 for the "incidental" use of material from a work in advertisements by the media to illustrate the content of the underlying work, "giv[ing] [the defendants] the ability to publicize their newsworthy [works] without violating the right of privacy statute." *Hoepker v. Kruger*, 200 F. Supp. 2d 340, 350 (S.D.N.Y. 2002) (brochures and newsletter to promote art exhibit not for purposes of trade); *see also Groden v. Random House, Inc.*, 61 F.3d 1045, 1049 (2d Cir. 1995) (advertisement for book employing plaintiff's photo held to be incidental use); *Kane v. Comedy Partners*, No. 00 Civ. 158, 2003 U.S. Dist LEXIS 18513 (S.D.N.Y. Oct. 15, 2003), *aff'd*, 98 Fed. Appx. 73 (2d Cir. 2004) (use of excerpt from *The Daily Show* to illustrate content of the program is non-actionable incidental use).

[6] The Complaint also fails to allege any supporting facts to plausibly show that the claimed damages are proximately caused by the episodes' use of Evans' image, as distinct from his involvement in the crime. The murder case was well known and reported in the small community in which Evans' family resides, and therefore his reputation was "damaged" as a result of people knowing that he had been arrested (and ultimately convicted) of murder.

regarding such claims is substantially similar to the New York statute. Like Sections 50 and 51, the Arkansas common-law tort of "appropriation" is limited to the "commercial use" of a likeness. *Stanley v. General Media Communications, Inc.*, 149 F. Supp. 2d 701, 706 (W.D. Ark. 2001) (internal citations omitted). "Mere publication of the person's likeness in a commercial newspaper or magazine does not create a cause of action for misappropriation." *Id.* (use of plaintiffs' names and photographs in *Penthouse* did not qualify as a commercial use as required to state a claim). Early caselaw from the Arkansas Supreme Court specifically mentions that, "One who unwillingly comes into the public eye because of his own fault, as in the case of a criminal" cannot object to "photographic reproductions of himself and his family." *Olan Mills, Inc. v. Dodd*, 234 Ark. 495, 498, 353 S.W.2d 22, 24 (1962).

Likewise, the Texas' common law cause of action for the unauthorized appropriation or exploitation of a person's name or likeness similarly requires that the likeness be used for the commercial benefit of the defendant. *See, e.g., Benavidez v. Anheuser Busch, Inc.*, 873 F.2d 102, 104 (5th Cir. 1989) (the incidental benefit of increased goodwill in the Hispanic community from the use of plaintiff's likeness in documentary made by Anheuser Busch about Hispanic Congressional Medal of Honor winners was not a sufficient benefit to the defendant beer company to give rise to a misappropriation claim). Such "commercialization of [plaintiff's] personality" must be "through a form of treatment distinct from the dissemination of news or information." *Id.* The cause of action is not available when the use is for a newsworthy purpose or in an incidental manner. *Matthews v. Wozencraft*, 15 F.3d 432, 437 (5th Cir. 1994); *Whitehurst v. Showtime Networks, Inc.*, No. 08 Civ. 47, 2009 U.S. Dist LEXIS 87530, at *7 (E.D. Tex. Aug. 28, 2009) (use of James Byrd's likeness in television docudrama about his death could not be misappropriation because events depicted in the film were already in the public

record as newsworthy events). In sum, because the Program and the Follow-Up Program use Plaintiff's image for a newsworthy purpose, his claim is defective as a matter of law under both Arkansas and Texas law.

The Fifth Circuit further limits the cause of action to where an appropriation was made for the "value" associated with the individual's name or likeness. *Matthews*, 15 F.3d at 437. Thus, there must be something "unique" about the person's name, or the alleged tortfeasor must "cash in" on goodwill associated with the person's name. *Meadows v. Hartford Life Ins., Co.*, 492 F.3d 634, 638 (5th Cir. 2007). The value associated with a name may be based on its "reputation, prestige, social or commercial standing, public interest, or other values." *Aucoin v. Comerica Secs., Inc.* No. 3:08-CV-1275-D, 2008 U.S. Dist LEXIS 82661, at *6-7 (N.D. Tex. Oct. 15, 2008). Under Texas law, therefore, the singer Don Henley's claim against Dillards department store was sustained where an advertisement for henley-style shirts read, "This is Don" and "This is Don's Henley," because the advertisement purposely intended to capture the commercial value of a perceived endorsement by Mr. Henley. *Henley v. Dillard Dep't Stores*, 46 F. Supp. 2d 587 (N.D. Tex 1999). Yet where the plaintiff's name was determined to have no independent value apart from the interest in his newsworthy life story, a fictionalized biography of a former undercover narcotics officer did not quality as misappropriation. *Matthews*, 15 F.3d at 437. Mr. Evans has not, and cannot, claim that his image carries independent commercial value, and for that additional reason as well, his claim would necessarily fail under Texas law.

## CONCLUSION

For all the reasons set forth herein, defendants respectfully request that the Complaint be dismissed with prejudice.

Dated: New York, New York
December 2, 2009

Respectfully submitted,

DAVIS WRIGHT TREMAINE LLP

By: ______________________________

Linda Steinman (LS 5906)
Elisa Miller (EM 1174)
1633 Broadway 27th floor
New York, New York 10019
(212) 489-8230

*Attorneys for Defendants*

TO: Pro Se Lavelle Evans (REG # 12039-078)
Jim Wells B
Federal Correctional Institution
P.O. BOX 4200
Three Rivers, TX 78071